UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Christopher Miller, II, | : | Case No. 1:13-cv-734 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| CSX Transportation, Inc., | : | |
| | : | |
| Defendant. | : | |

## ORDER

Defendant, CSX Transportation, Inc. ("CSX"), has filed a motion for summary

judgment against Plaintiff, Christopher Miller, II.  (Doc. 62)  CSX seeks judgment on

Miller's complaint, alleging claims under the Federal Railroad Safety Act, 49 U.S.C.

§20109, and the Federal Employers Liability Act, 45 U.S.C. §51, et seq.  Miller opposes

the motion (Doc. 64), and CSX has filed a reply.  (Doc. 66)  CSX has also filed a motion

to exclude Miller's expert testimony (Doc. 60), which Miller opposes (Doc. 63).

For the following reasons, the Court will grant in part and deny in part CSX's

motion for summary judgment, and will grant the motion to exclude.

## FACTUAL BACKGROUND

Miller worked for CSX as a conductor at the Cincinnati/Queensgate railyard.

Prior to the incidents giving rise to this case, he was employed by CSX for at least eight

years (he could not recall the specific year he started working).  He is a member of the

United Transportation Union ("UTU") which represents the conductors and other

craftsmen, and he is subject to the collective bargaining agreement between CSX and

UTU.  James (Jimmy) Spencer is the Cincinnati terminal superintendent for CSX, who

has general responsibility for the railyard operations. He reports to David Hamby, the division manager for CSX's Louisville division, which includes Cincinnati.

CSX has adopted workplace rules to foster a safe working environment, and all employees must complete regular (at least yearly) training on CSX's rules and procedures. The "CSX Safe Way" publication includes safety rules that all CSX employees must follow. General Safety Rule 5 states:

> Any employee experiencing an on-duty injury must report the injury to a supervisor at the time of the occurrence prior to leaving the property on the day of the occurrence so that prompt medical treatment may be provided. A form PI-1A must be completed by the employee reporting the injury. ... Employees must immediately notify their supervisor of the decision to seek medical attention as a result of any on-duty injury. This requirement is intended to facilitate work coverage and timely regulatory reporting.

In addition to ensuring that an injured employee receives treatment for any injury, CSX notes that prompt reporting is crucial to preventing injuries to other employees, as it allows CSX to address unsafe conditions or railyard hazards. CSX must also report personal injuries to the Federal Railroad Administration. CSX submits a training transcript for Miller, which reflects that he completed a general course on operating rules on March 23, 2012, June 14, 2011, January 18, 2010, and "Rules Test" courses in each previous year of his employment. (Doc. 62, Ex. 4, Hamby Declaration at PAGEID 434-435.)

CSX has also adopted a progressive discipline policy that applied to Miller's craft conductor position, entitled the "Individual Development & Personal Accountability Policy" ("IDPAP"). This policy classifies incidents into three categories: minor, serious, and major. Minor offenses are rule violations that do not result in a train derailment,

equipment damage, or those not classified as serious or major.  Such offenses, if not frequent or repeated, are typically handled informally.  Serious offenses are rules violations resulting in derailment or equipment damage, as well as other situations that may be classified as serious depending upon the circumstances.  A single serious offense will not warrant dismissal, but may warrant suspension or retraining.  The IDPAP describes the progressive discipline that will apply to serious incidents.  Major offenses are those that "warrant removal from service pending a formal hearing and possible dismissal from service for a single occurrence" if the employee is proven to be responsible.  Major offenses include "altercation, dishonesty, concealing material information or providing false material information about matters under investigation, theft, insubordination, Rule G, weapons on the property ...", and certain train operational violations that exhibit "blatant disregard for the rights of employees or the company" or cause harm to others.  (Doc. 62, Ex. 4, Hamby Dec., at PAGEID 427.)

Part VI of the IDPAP covers the reporting of personal injuries, and states that no formal disciplinary hearings will be held "solely to investigate an individual's personal injury."  However, injuries resulting from rule violations will be handled under the IDPAP section covering serious offenses.  Part VI also states that "All personal injuries must be reported to the appropriate supervisor at the time of occurrence prior to leaving the property on the day of occurrence so that prompt medical treatment may be provided and unsafe conditions can be promptly addressed. ... Failure to adhere to these reporting procedures will subject the employee to appropriate handling under the IDPAP, up to the level of a Major Offense."  (Id.)

If CSX learns of circumstances suggesting that a rule violation has occurred, it

sends a letter to the employee notifying him or her of the incident and requiring the employee to attend an "on property" hearing. The CBA's Rule 16 requires that all charges of unsatisfactory service or incompetent conduct must be in writing, and include a full statement of the charges. Rule 17 forbids any discipline against an employee prior to a fair hearing before a "proper officer." The employee has the right to have witnesses present and to be represented by counsel. Rule 17(c) requires that a hearing must be held within seven days of the charging letter when possible. Disciplinary hearings are recorded and transcribed, and are conducted by CSX management staff who are appointed by CSX to conduct hearings.

On August 23, 2012, Miller reported to Brandon Hinton (the Cincinnati assistant superintendent) that he had been injured at work on July 25, 2012. Miller wrote out a statement describing the incident, and filled out a CSX Form PI-1A, entitled "Employee's Injury and/or Illness Report." (Miller Dep. Exs. 2 and 3) In the Form PI-1A, Miller reported that he hurt his back while stepping down from the bottom step of a locomotive. He was holding a lantern in one hand, and lost his grip on the traincar while stepping down on the gravel "ballast" surrounding the train tracks. His foot slipped, and his back twisted and made a "pop sound" followed by a sharp pain. Miller checked a box on the form stating that CSX was at fault due to the overly high height of the step on the traincar, inadequate lighting, and loose ballast he stepped onto that night. He also claimed that overhead lights were burned out at the location in question. In his deposition, Miller said that when he stepped down from the train, "I had a little moment of pain, some tingling, heard a little bit of a popping sound. And, you know, I just stood there for a little bit. I was just hoping that [it] was just maybe a vertebrae just stretching

-4-

out, you know, a little air pocket or whatever." (Miller Dep. at 154) Miller also reported to Hinton and Spencer on August 23 that about five days after the incident, he went to a local emergency room and reported that he had been injured at work. He had x-rays taken, and he was prescribed pain pills and other medication and advised to followup with his physician.

And on August 20, Miller was examined by his orthopedist, Dr. Grefer, about his back. According to the medical records, Miller told Dr. Grefer that he was injured climbing down from a train, when he slipped, twisted and stepped on loose ballast. Miller reported pain in his back and right leg that had persisted for a month. Dr. Grefer thought his findings were suggestive of lumbar and thoracolumbar strain and sprain, and ordered a bone scan to rule out an occult fracture. He recommended continued medication, and wearing a brace at work if possible. (Doc. 62, Ex. 16) The PI-1A form includes a place for an employee to authorize the release of medical information to CSX, but Miller did not sign the authorization when he completed the form on August 23.

Spencer testified that Hinton called him when he first spoke to Miller that day, and Spencer went to the railyard and talked to both of them. Spencer and Hinton went to the railyard to investigate, but Miller's description of the location of the incident was very vague. And because a month had passed, Spencer could not determine if any condition on the track or in the yard may have contributed to the reported injury. Spencer reported the situation to David Hamby the same day, which Spencer said was his routine practice whenever he is notified of an employee's injury. Hamby authorized the issuance of a letter to Miller, initiating a formal disciplinary investigation and on-

property hearing to be held on August 30, 2012.  That letter, addressed to Miller, is dated August 24, 2012 and is signed by J.R. Arwine, Hamby's assistant Division Manager in Louisville.  (Arwine was not apparently directly involved in the investigation; Spencer explained that all "charging" letters are issued under Arwine's signature.)  The letter informed Miller that the purpose of the investigation was to develop facts concerning his August 23 report of injury and the reasons he did not report it timely, his failure to notify his supervisor of his decision to seek medical attention, and his failure to completely fill out the PI-1A form when he reported the injury on August 23.  (Doc. 62-2, Spencer Dep. Ex. 1, at PAGEID 394)  Copies of the letter were sent to Spencer and Hinton, and to K.R. Kremer (an engineer) and E.D. Canupp (a yardmaster), who were listed as witnesses.

A few days later, on August 27, Spencer received a call from Miller's UTU representative Terry Collett.  According to Spencer, Collett asked if he and Miller could come and talk to Spencer about Miller's injury report.  Spencer could not recall specifically what Collett told him, but basically that Miller "wanted to add another statement, or something to that effect ...".  (Spencer Dep. at 93)  Collett sent Spencer an email the same day, August 27, asking Spencer to "please let me know what time to tell [Miller] to come in and retract his injury report."  (Spencer Dep. Ex. 3)  Spencer agreed to see them the next day, but denied ever telling Collett that Miller could "retract" the injury report.  Spencer reported Collett's call to Hamby, who authorized Spencer to meet with Miller and accept any statement he wished to give, but to confirm to Miller that there was no guarantee that any additional statement would "change anything." (Spencer Dep. at 97)

-6-

On August 28, Miller and Collett met with Spencer and Pat Henry, Division Manager for Operating Practices.  According to Spencer, Henry handles anything safety related.  (Id. at 98)  Spencer testified that he and Henry told Miller and Collett that they would be glad to accept anything Miller wanted to add to his injury report, and stressed to him several times that he should not write anything that is not truthful: "Just tell us what you want us to know and we'll take it into consideration, but, you know, this doesn't necessarily mean it's going to change anything."  (Id. at 100)   During the meeting, Spencer and Henry left the room for a while to allow Miller to consult with Collett.  In the end, Miller submitted a second handwritten statement, which states that it was a

> ... revision retracting the statement that I wrote on 8/23/12 in regards to claiming that I hurt myself while on duty ... .  In hindsight and rethinking about everything earlier in the evening around 6:30 pm I was working on my car in my garage.  I remembered while working on my engine and slipping on some spilled oil on the floor and I fell and while falling twisted my back and felt some very bad back pain.

(Miller Dep. Ex. 4)  Miller wrote that he finished what he was doing and reported to work, thinking that he was OK.  He believed that it was the slip on oil at home, and not stepping down from the train, that caused his back pain.  Miller also stated that he released CSX from any responsibility for his injury.

Miller testified that he "had to sign" the second statement because he "had no choice."  He claimed that during the August 28 meeting, "they (Spencer and Henry) led him down the avenue that per Mr. Hamby, that if I did everything they told me to do, that I would get back with little or no penalty."  He admitted that neither Spencer nor Henry actually said these words or anything close to them during the meeting.  But he testified

that they "made gestures" and nodded their heads which indicated to Miller that if he retracted his injury report, he would be able to go back to work.  He conceded that no one at CSX "told him" to retract the statement or made any promises to him, but testified that he had "no choice" because Collett told him to do so.  Miller testified that  the August 28 statement was submitted by Collett, that "[i]t was forced in front of me to put my signature on, so I did sign off on it because I had no choice."  (Miller Dep. at 201)

The on-property disciplinary hearing was held on Saturday September 1, and was conducted by Angelo Cassaro, a CSX trainmaster.  Present at the hearing were Miller, Collett, Spencer, and the two witnesses Canupp and Kremer.  Spencer testified that during the first meeting on August 23, when Miller completed the injury report form, he asked Miller why he had not reported it earlier; Miller told Spencer that he "didn't think it was a big deal" and so he continued to work through it.  (Doc. 64, Ex. D at 10, PAGEID 989)  Spencer explained that after Miller left that day, he interviewed and obtained statements from Kremer (the engineer working with Miller on the night of July 24-25), and from Canupp, the yardmaster on duty that night.  Both of them said that Miller had not complained about or mentioned an injury that evening.

During the investigation, Spencer had also obtained audio recordings of radio and telephone communications that evening, which are captured by CSX equipment on a regular basis.  Two of those recordings, a conversation between Miller and Canupp at 12:53 a.m., and another conversation at 4:34 a.m., were played and transcribed into the hearing record.  Spencer then testified about the events of August 27-28 and receiving Miller's retraction of his injury report.  He identified the CSX rules that he believed Miller had violated, including submitting a dishonest statement about how he was injured.

Miller then testified, and Collett asked him whether in retrospect, after he completed the first injury report and then found out that he may have violated CSX Rule GS-5, he "had time to rethink the situation, and everything that happened that evening, you came back on August 28 ... and you made a revision...". Collett asked him if he "absolutely in your mind hurt yourself at home and not work?" Miller twice responded, "I guess so, yes." (Doc. 64, Ex. D at PAGEID 1022-23)

Both sides stated that there were no other witnesses or evidence to be presented, and Collett made a brief closing statement on behalf of Miller. Collett said that he was unaware of Miller's August 23 report of injury before Miller completed it. He subsequently talked to Miller and pointed out that he violated Rule GS-5; thereafter, Miller started thinking about the events of July 24 and told Collett about the incident in his garage. That led to the August 28 meeting with Spencer and the retraction/revision statement Miller submitted. Collett claimed that Miller had no intent to make a false statement, and just didn't think about reporting the injury before he did so on August 23. He asked CSX to show leniency on Miller's behalf and not terminate him.

Miller then began to make his own statement, but at the request of Collett, the hearing continued off-record. During the next approximately half-hour, Miller apparently made a statement regarding accusations of racial discrimination, harassment and intimidation. That statement was not recorded or transcribed. After the transcription resumed, Cassaro informed him that the disciplinary hearing was not the proper place to raise his accusations, and offered Miller the opportunity to make a formal complaint against the CSX officers that he apparently identified off-record. Cassaro described Miller's statement as making "serious accusations." (Id. at PAGEID1026) Miller

-9-

refused to address the accusations "because I'm a team player. I want to move forward and get back to work." Cassaro responded that he needed to know if Miller wanted to file a formal complaint of harassment and intimidation against the CSX officers he named while off the record; again, Miller said he would not do so "because it will only verbally get worse, and I want to move forward and get back as quick as I can to provide for my family." Cassaro again asked Miller if he understood that he had the option to make his complaint; Miller then stated that his back was hurting him such that he could not "rationally think all of this out right now." Cassaro gave Miller the CSX Ethics "hotline" phone number, which would allow him to make a formal complaint. He also asked Miller if he needed medical attention or transportation, and Miller said no, it would not be necessary. Cassaro recessed the investigation, and told Miller that if he sought any additional medical attention before the hearing was reconvened, he should promptly inform his immediate supervisor.

In his deposition, Miller testified that while the hearing continued off-record, he started to read a statement that he had written out by hand. He was not sure how much of the statement he actually read, and at some point he stopped reading and tried to tell Spencer and Cassaro what he felt about the situation. (Miller Dep. at 327-329; Exhibit 14 is the hand-written statement.)

The on-property hearing was briefly reconvened on September 6. After asking Miller and Collett to confirm that they were allowed to present any evidence and witnesses they wished, Cassaro adjourned the hearing. (Doc. 62-2 at PAGEID 404). Cassaro submitted his "Notice of Findings" to Hamby a few days later, in which he found that Miller had violated Rules GS-5 and GS-2. Cassaro concluded: "A reasonable

person could only be left to believe that by the introduction of the second statement by Mr. Miller the gravity of his situation had begun to sink in and this is an attempt to undo the act of reporting the alleged injury in the first place.  By doing this this only compounded his problems [sic].  In the end you could not have a clearer cut decision; Mr. Miller is in violation of GS-5 and GR-2."  (Doc. 62-3, Cassaro Dep. Ex. 5, at PAGEID 418-419)  Hamby reviewed Cassaro's findings, together with the transcript of the on-property hearing and the exhibits submitted.  He concluded that Miller's conduct warranted dismissal from CSX.  And on September 10, 2012, Hamby wrote to Miller to inform him of his decision.

On November 12, 2012, Miller filed an OSHA complaint alleging that CSX retaliated against him under Section 20109 of the Federal Rail Safety Act when it terminated his employment.  The Secretary dismissed his complaint by letter of June 4, 2013, finding that a preponderance of the evidence did not support his claim that his protected activity (reporting a workplace injury) was a contributing factor in CSX's decision.   Miller appealed that determination to DOL, and gave proper notice of his intent to file this action, pursuant to 49 U.S.C. §20109(d)(3).  His complaint was timely filed on October 10, 2013.

After lodging his initial OSHA complaint, Miller also filed a charge of discrimination with the EEOC on April 15, 2013, alleging that he was an African American with a disability and that CSX discriminated against him and discharged him for a late report of injury.  (Miller Dep. Ex. 11)  The EEOC issued a notice of right to sue on August 28, 2013.  Miller raises no discrimination claims in this case based on Title VII or the Americans with Disabilities Act.

**DISCUSSION**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The moving party has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The court's function is not to weigh the evidence and determine the truth of the

-12-

matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).  The court must construe the record in the light most favorable to the non-movant, and draw all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Federal Railway Safety Act

As pertinent to this case, the FRSA states:

> A railroad carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done ... to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee[.]

49 U.S.C. §20109(a)(4).

A railroad employee's claim of retaliation under this statute is governed by the procedures adopted in the Wendell H. Ford Aviation Investment and Reform Act, 49 U.S.C. §42121 ("AIR-21").  To establish his claim, Miller must show by a preponderance of the evidence that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an adverse personnel action; and (4) the protected activity was a contributing factor to the adverse action.  If he satisfies this

burden, CSX may avoid liability if it proves by clear and convincing evidence that it would have taken the same action (terminating Miller) if Miller had not engaged in protected activity.  CSX contends that Miller cannot satisfy his initial burden, because he did not report a workplace injury in "good faith" as the statute requires.  And because he did not act in good faith, CSX argues that it lacked knowledge that Miller engaged in FRSA-protected activity.  For the same reason, Miller's report of injury could not be a contributing factor to CSX's decision to terminate his employment.

This Court has previously concluded that the "good faith" requirement of the statute incorporates both a good faith belief that an injury was work-related, and good faith in making the injury report.  See Murphy v. Norfolk Southern Railway Co., Case No. 1:13-cv-863 (S.D. Ohio), Order Denying Summary Judgment (March 3, 2015) at p. 11 n.3 (hereinafter cited as "Murphy").  The Court cited Black's Law Dictionary 693 (6th ed. 1990) defining good faith: "In common usage, [good faith] is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." Thus an employee who in good faith believes he was injured at work and makes a report must also show that he submitted the report with good faith intent.

CSX argues that part of Miller's report was his August 28 retraction of his initial report, changing his story from a workplace injury to an injury that happened in his garage.  One of those reports was not true, and CSX notes Miller's admission that CSX rules forbid dishonesty.  CSX suggests that these facts support a conclusion that Miller attempted to avoid making any report at all about his injury.  He told Spencer and Hinton that he reported it on August 23 only because he couldn't miss any more work.

-14-

CSX therefore contends that there is no genuine factual dispute that Miller lacked "honesty of purpose" in reporting his injury.

There are relatively few reported cases addressing the contours of FRSA's "good faith" requirement.  At least two cases hold that the employee's good faith must be measured at the time he first reports the injury to the railroad.  In Ray v. Union Pacific Railroad Co., 971 F.Supp.2d 869 (S.D. Iowa 2013), the district court considered a case raising analogous facts to Miller's claim.  The plaintiff, Thomas Ray, worked for the railroad for over ten years; in 2008, he was diagnosed with degenerative arthritis and obesity.  The pain worsened over time, and in October 2009, he needed surgery on his right knee.  He told his supervisor that the surgery was not related to his railroad work, and he was granted time off.  A few days after his surgery, an attorney representing Ray told the railroad that Ray had cumulative knee injuries caused by his work and he intended to file a FELA claim.  A week later, Ray reported to his supervisor that his knee condition was work related and completed a written report, stating that he first became aware that his condition was work-related "a year ago."  Five days after his report, the railroad charged Ray with violating work rules requiring honest conduct and immediate reporting of any on-duty injury.  At the investigation hearing, Ray testified that he did not realize until after his surgery that his railroad work may have contributed to the wear and tear on his knees or to cumulative knee trauma.  He also claimed that during the meeting when he did report his injury, he felt intimidated by the three supervisors who were questioning him.  The railroad terminated Ray for violating its late-injury report rule and the rule forbidding "dishonesty."

In his FRSA retaliation lawsuit, the railroad argued that Ray did not engage in

protected activity because he did not make his injury report in "good faith," because Ray changed his story several times about his injury and the reason for his late report.  The district court found that the good faith requirement of the statute does not apply "... to all of an employee's interactions with a railroad.  Rather, the phrase 'good faith' applies directly to a singular 'act done ... to notify ... the railroad carrier ... of a work-related personal injury.' ... Thus, even assuming that Plaintiff was dishonest with Defendant on one occasion or another, the relevant inquiry remains whether, *at the time he reported his injury* to Defendant, Plaintiff genuinely believed the injury he was reporting was work-related." Id. at 883-884 (internal citations omitted; emphasis in original).

And in Koziara v. BNSF Railroad Co., 2015 U.S. Dist. LEXIS 2382 (W.D. Wisc. 2015), plaintiff was supervising a crew removing heavy planks at a railroad crossing when one of the planks came loose and hit him in the left shin.  He did not think he was seriously hurt; he reported the incident to a roadmaster, but did not file an injury report or see a doctor, and he worked the next day (Friday) without a problem.  He went to a previously scheduled unrelated doctor's appointment on Monday and described the incident; an x-ray then revealed a fractured left tibia.  Plaintiff told two co-workers that he would be out of work for several weeks because he hurt his leg at home over the weekend.  He then called his union representative, who advised him to file an injury report with the railroad (and referred him to an attorney).  He called his co-workers back, told them he was "kidding" about being injured at home and that his leg injury had happened at work.  He then reported the injury to a supervisor and completed an injury report.  The railroad did not contest his injury and paid for his medical care, but it did investigate the incident and eventually disciplined plaintiff for careless conduct and his

failure to be alert and attentive to the plank removal. No discipline was imposed for his late injury report.

However, during the investigation, plaintiff's crew members reported another incident about a week before the plank accident, when they saw plaintiff jump off a trailer and appear to injure his leg, suggesting that plaintiff's fracture may have occurred in that previous incident which had not been reported. The railroad also discovered that plaintiff had taken and/or given away some used railroad ties without the railroad's permission. It opened another investigation into the alleged theft of railroad ties, and then terminated him for theft, dishonest conduct, unauthorized removal of BNSF property, and misuse of company equipment for personal use while on duty. In plaintiff's FRSA lawsuit, BNSF argued that plaintiff did not act in good faith in reporting his injury; he initially lied to his co-workers, and their subsequent statements during the investigation suggested he might have been injured in the prior incident. The district court denied summary judgment, finding a genuine factual dispute on the issue of plaintiff's good faith. The court noted that a jury could conclude that plaintiff objectively and subjectively believed his injury was work-related at the time he **first** reported it to the railroad.

Here, taking the facts in the light most favorable to Miller, he alleges he was injured during his night shift on July 24-25; he did not believe the injury was serious, and he was distracted by the fact that he was having an unrelated surgical procedure later that morning. He was given pain medication after that surgical procedure, which he believes masked any symptoms of a back injury for several days. He reported to an ER five days later that he had hurt his back at work, and was prescribed additional pain

medication; and he told Dr. Greve on August 20 that he had injured his back at work in the manner described in his August 23 initial injury report.  A jury could believe that Miller had a good faith belief (both actual and reasonable) that he had hurt his back in the manner he described when he first reported it to CSX.  CSX is not entitled to summary judgment on the basis that Miller's report of injury was not made in good faith.

CSX also argues that because it lacked knowledge that Miller reported an injury in good faith, Miller cannot show that CSX knew that Miller engaged in protected activity. There is a factual dispute about whether Miller reported an injury in good faith. And CSX does not argue that it did not know about his injury report.  A similar argument was rejected in Davis v. Union Pacific Railroad Co., 2014 U.S. Dist. LEXIS 101708 (W.D. La. 2014), where the court noted that "employers would effectively be immune under the FRSA if they could allege sufficient facts to show they thought the employee might be lying or otherwise acting in bad faith. ... The statute would be far less protective if an employer could avoid liability simply by arguing it thought the plaintiff was acting in bad faith, rather than by actually showing the plaintiff was acting in bad faith."  Id. at *21.  CSX knew about Miller's report, as it argues that it was the late report that instigated the investigation that led to Miller's termination.

CSX also argues that Miller cannot satisfy the fourth prong of his prima facie case, that his injury report was a "contributing factor" to his termination.  Miller can establish that his report was a contributing factor by either direct or circumstantial evidence.  CSX contends that Miller lacks evidence that CSX intentionally retaliated against him; that his false representations about how the injury occurred constitute an intervening event that independently justified his termination; and that CSX followed

"long-standing railroad industry standards" when it terminated Miller for dishonesty.

In one of the first appellate decisions to address the 2007 FRSA amendments at issue here, the Second Circuit noted that the AIR-21 framework is far more protective of plaintiffs than the McDonnell-Douglas burden-shifting framework that applies to other employment-based discrimination and retaliation claims. It further stated that a "contributing factor" is a term of art used in other whistleblower statutes, and is broadly interpreted to mean "any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." Araujo v. N.J. Transit Rail Ops. Inc., 708 F.3d 152, 158 (2d Cir. 2013). The court also held that a plaintiff need not conclusively demonstrate an employer's retaliatory motive in order to show that his report was a contributing factor to the adverse action. Id. at 158-159; Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791 (8th Cir. 2014)(employee need not "conclusively demonstrate" a retaliatory motive at the prima facie stage of an FRSA claim).

In Ray, discussed above, the district court rejected the railroad's argument that Ray could not prove that his injury report contributed to his dismissal, because the undisputed evidence demonstrated that the railroad believed he was guilty of dishonesty and late injury reporting, and he was terminated on that basis. The court noted that only five days after he reported a workplace injury, he was notified to appear for a hearing on whether his report violated the railroad's Rule 1.6 (prohibiting dishonesty, based on his prior statement that the injury was not work-related) and Rule 1.2.5 (requiring immediate injury reports). Ray's hearing was held about three weeks later, on December 22, and he was terminated on December 30. The district court cited the temporal proximity between his initial report and the launch of the investigation, and

found that the facts raised a genuine dispute whether the injury report was "inextricably intertwined" with his termination.  Ray, 971 F.Supp.2d at 888.  For that conclusion, the district court cited two ARB decisions holding that when an injury report and an adverse action are "inextricably intertwined," a presumptive inference of causation prevents entry of a summary decision in favor of the employer: Henderson v. Wheeling & Lake Erie Railway, No. 11-013, 2012 DOL Ad. Rev. Bd. LEXIS 106 (ARB Oct. 26, 2012), and DeFrancesco v. Union R.R. Co., No. 10-114, 2012 DOL Ad. Rev. Bd. LEXIS 23 (ARB Feb. 29, 2012).  The district court additionally noted that whether or not the railroad acted reasonably in finding Ray guilty of other rule violations, the only issue in his FRSA claim was whether the injury report contributed to the adverse decision: "Indeed, even if dishonesty and late reporting comprised 99.9% of the reason Defendant discharged Plaintiff, Plaintiff's FRSA actions would still be viable because his injury report could still have been 'a contributing factor' in the disciplinary action."  Ray, 971 F.Supp.2d at 885 n.19.  The same result applies here.

CSX also argues that Miller has not shown that CSX acted with retaliatory animus or improper motive, thus entitling it to summary judgment.  As the cases cited above have held (and as CSX concedes), animus can be inferred from circumstantial evidence.  Miller cites the temporal proximity between his initial report, the charging letter issued the next day, and his termination less than three weeks later.  The day after Miller reported the injury, CSX formally launched its investigation and held Miller out of service.  Miller cites an August 27 email from Pat Henry to CSX's General Manager of Safety Compliance, providing an "update" on Miller's injury report.  Henry states that a late report assessment had been entered, that Miller was coming in later

that day to "clarify" his position, and that Hamby would take whatever Miller said into consideration when "determining how severely" Miller would be disciplined. (Doc. 64, Ex. O) Miller argues that the email demonstrates that CSX decided to discipline him immediately after he filed his injury report, regardless of anything he said during the August 28 meeting or thereafter. Based on all of the circumstantial evidence, the Court finds that there is a factual dispute about whether the initial August 23 injury report was a contributing factor to Miller's termination.

CSX further contends that even if the injury report set in motion the events leading to the termination, Miller's intervening act of retracting his report and claiming that he injured his back at home breaks any causal connection between the initial report and CSX's ultimate decision. CSX cites Kuduk v. BNSF, supra, where the plaintiff was a long-term railroad employee who committed a serious rule violation and was placed on probation for a year, with a warning that further violations could lead to his discharge. During his probation, he reported through BNSF's safety issue resolution process ("SIRP") that a piece of equipment used to derail cars was too heavy and could cause back injuries. About two weeks after plaintiff made this report, a trainmaster and another supervisor saw plaintiff walking between tracks, which is a serious safety violation. That led to an investigation, a hearing, and plaintiff's termination. The final decision was made by BNSF's division manager and approved by its regional vice president. Both of the supervisors who observed the incident testified in his disciplinary hearing, but they were not otherwise involved in the decision to terminate plaintiff. One of those supervisors had been assigned to investigate plaintiff's SIRP equipment report. He concluded the equipment met safety requirements, and that investigation was closed

-21-

four days after plaintiff was terminated.  In his FRSA lawsuit, plaintiff alleged his SIRP report contributed to the decision to fire him, arguing that the supervisor's knowledge of his report should be imputed to the individuals who approved his termination under the "cat's paw" theory.  The district court found that Kuduk had no evidence that the decisionmakers had any knowledge of his SIRP report, or that the report of seeing him walking between tracks was in any way related to his SIRP equipment report.  The supervisors testified at Kuduk's disciplinary hearing that they saw someone walking the tracks, approached and realized it was Kuduk, and ordered him off the tracks.  Kuduk did not contradict this testimony, but argued that the circumstances justified his decision that day.

The district court found that BNSF gave a consistent explanation for the termination, and there was no evidence of "pretext, shifting explanations, antagonism or hostility toward plaintiff's protected activity, or a change in attitude toward Plaintiff after he engaged in protected activity."  Kuduk, 768 F.3d at 790.  Nor was the temporal proximity of the salient events, standing alone, sufficient to show that his protected activity contributed to his discharge.  The court found it significant that his protected activity was completely unrelated to the later incident that led to his discharge; moreover, the fact that Kuduk was on probation at the time for a serious safety violation undercut any significance of the temporal proximity of the events.  The Eighth Circuit affirmed, finding it particularly significant that the protected activity was completely unrelated to the serious violation that led to Kuduk's discharge, and describing his violation as an intervening event that "independently" justified the termination.  Id. at 792.

Relying on Kuduk, CSX contends that Miller's August 27 retraction of his original injury report is an independent, intervening event that justifies his termination, and breaks any causal link between his injury report and his termination. But the specific facts at issue in Kuduk distinguish it. Miller reported his injury to Spencer, who immediately notified Hamby, the decision-maker; Hamby was also informed of the retraction and states he took Miller's conflicting stories into account in reaching his final decision. The two incidents - an initial report of a workplace injury and the subsequent retraction - were certainly related, if not intertwined. Miller also notes that the September 10, 2012 letter to him terminating his employment did not cite his violation of a rule prohibiting dishonesty.

Finally, CSX contends that firing a dishonest employee is standard practice in the railroad industry, citing numerous Public Law Board decisions affirming the termination of dishonest or "untrustworthy" employees. By adhering to this standard practice, CSX argues that it did not retaliate against Miller for reporting an injury. Miller rightly responds that PLB decisions are not relevant to the question of whether his injury report was a contributing factor to his termination. A PLB decision is a review of an arbitration award entered in proceedings conducted under a collective bargaining agreement.

Based on the entire record and the cases interpreting the FRSA, the Court concludes that Miller has established a genuine factual dispute on whether he acted in "good faith" in reporting an injury, and whether his protected activity was a "contributing factor" to his termination.

Election of Remedies

A section of the FRSA states that an employee "... may not seek protection under

both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." 49 U.S.C. §20109(f). CSX argues that Miller's decision to file a claim with the EEOC precludes his FRSA claim under this provision. His EEOC charge relied on the same facts he alleges to support his FRSA claim: he was injured and then terminated for reporting his injury. CSX contends that the statute requires Miller to choose one remedy, and his EEOC claim was filed before his lawsuit. Miller responds that he has not sought "protection" under Title VII or the ADA, and that an EEOC claim is a required administrative prerequisite to any legal claim (which he has not asserted to date). He therefore argues that he is not "seeking protection" under Title VII but is electing to do so under FRSA by litigating his claim.

Most of the reported cases discussing Section 20109(f) address whether a plaintiff may proceed with an FRSA claim after arbitrating a grievance under the Railway Labor Act. The majority, if not all, courts have concluded that RLA arbitration does not preclude an FRSA claim, because the RLA establishes the procedural framework for pursuing a remedy under a collective bargaining agreement. The employee does not "seek protection" under the RLA, but seeks to enforce the terms of his CBA. See, e.g., Norfolk Southern Railway Co. v. Perez, 778 F.3d 507, 513 (6th Cir. 2015)(employee seeking to enforce rights under a CBA is not "seeking a remedy for a right that is guaranteed to him by the RLA").[1] In Perez, the Sixth Circuit reviewed the history of the subsection, which was first adopted in 1980; some legislative history suggested the provision was intended to preclude an FRSA claimant from pursuing a potential

---

[1] The court agreed with results in Grimes v. BNSF Ry. Co., 746 F.3d 184, 191 (5th Cir. 2014), and Reed v. Norfolk Southern Ry.Co., 740 F.3d 420 (7th Cir. 2014).

independent remedy under OSHA.  The 2007 amendments permitted employees to file
FRSA claims directly with the Secretary of Labor rather than under the RLA, and to
pursue a civil action in the district courts.  These amendments also added  Section
20109(h), which now states: "Nothing in this section shall be deemed to diminish the
rights, privileges, or remedies of any employee under any Federal or State law or under
any collective bargaining agreement.  The rights and remedies in this section may not
be waived by any agreement, policy, form, or condition of employment."  Perez held that
if Section 20109(f) is construed to preclude an FRSA lawsuit after a plaintiff has
arbitrated his grievance under the RLA, Section 20109(h) would prohibit that limitation:
"[D]espite Norfolk Southern's argument, multiple considerations point in favor of reading
subsection (h) as trumping subsection (f), rather than vice versa."  Id. at 514.

One district court has cited the election of remedies provision in deciding if a
railroad employee bringing suit under Title VII was precluded from pursuing a state law
retaliatory discharge claim.  In Howell v. BNSF Railway Co., 2015 U.S. Dist. LEXIS
72060 (D.C. Ill., June 4, 2015), the court concluded that applicable Illinois law barred his
retaliatory discharge claim based on an alleged public policy violation.  In reaching this
conclusion, the court noted that the plaintiff did not assert an FRSA claim, which would
have provided him an adequate remedy (one of the factors considered to determine if
an Illinois retaliatory discharge claim may proceed).  The district court then observed
that if plaintiff had pursued an FRSA claim, he would have been precluded from
pursuing remedies under "any other law," citing Section 20109(f).  Id. at *12.

CSX argues that the Sixth Circuit's interpretation of Section 20109(h) in Perez
should be limited to the context in which the case arose, whether an FRSA claim is

precluded when the plaintiff pursues arbitration under the RLA.  But the Court does not

read <u>Perez</u> so narrowly, especially because the court specifically noted that the intent of

this subsection was to **expand** protections afforded to railroad employees, not to narrow

them.  It also clearly stated that it "would have little trouble concluding that, where

subsection (f) conflicts with subsection (h), the latter controls instead of the former."

<u>Perez</u>, 778 F.3d at 514.  The contrary dicta in <u>Howell</u> is not binding on this Court; and

the Sixth Circuit's interpretation of the interplay between Sections 20109(f) and (h)

counsel in favor of Miller's argument that his FRSA claim is not precluded by his  EEOC

claim.  The Court expresses no opinion as to whether the statute would preclude Miller

from prosecuting a claim under Title VII, the ADA, or another provision of law, given his

election to proceed in this case.

<u>CSX's Affirmative Defense</u>

CSX argues that even if Miller establishes a prima facie case, it has submitted

clear and convincing evidence that it would have terminated him even if he had not

reported an injury.

The "clear and convincing evidence" standard falls between the preponderance

of the evidence standard, and proof beyond a reasonable doubt.  In order to satisfy this

burden, CSX "must show that the truth of its factual contentions are highly probable."

<u>Araujo</u>, 708 F.3d at 159.  CSX again cites <u>Kuduk</u>, where the Eighth Circuit concluded

that the railroad had satisfied this demanding standard of proof.  The court of appeals

held that BNSF conducted a thorough investigation into Kuduk's conduct of walking the

tracks, a disinterested manager decided it warranted his termination, and that decision

was reviewed and approved by other uninvolved senior managers.  More importantly,

Kuduk had signed a waiver as part of the discipline imposed for his prior serious safety offense, in which he was expressly warned that an additional safety offense could result in his discharge.  BNSF presented uncontradicted evidence that it had discharged two other employees in the six months before Kuduk's termination after they committed a serious safety offense while on disciplinary probation.  The Eighth Circuit noted that while the FRSA "affirmative defense is often not suitable for summary judgment determination, we agree with the district court that BNSF submitted clear and convincing evidence that it would have discharged Kuduk whether or not he had made unrelated reports that were ... protected by the FRSA." Id. at 793.

CSX submits a declaration of Timothy Sherman, an administration and data manager, who reviewed and compiled records from CSX's database concerning disciplinary and injury reporting incidents.  Sherman states that 73 CSX employees from 2010 to 2012 were terminated (or resigned in lieu of termination) because they were dishonest.  And 49 employees in the Louisville Division reported injuries to CSX, but were not terminated.  The attached database entries describing terminations involving "dishonesty" include an employee driving on a suspended license and leaving the scene of an accident; rule violations resulting in derailments or other serious property damage where employees made false statements about the incident during subsequent investigations; theft of CSX's property; and submission of falsified medical records to justify a work absence.  CSX does not argue, and Sherman's declaration does not suggest, that every employee who was dishonest about anything that may pertain to the workplace was discharged.  Nor does CSX contend that every employee who did not file a timely injury report, or failed to timely report receiving medical care, was

terminated.  Moreover, as previously noted, the termination letter CSX sent to Miller does not cite dishonest conduct as a reason for his discharge (although it was mentioned in Cassaro's letter of findings to Hamby).

The "clear and convincing" standard is a very difficult one to meet, and essentially requires CSX to conclusively demonstrate that it is highly probable or reasonably certain that it would have discharged Miller if he had not reported the injury. While CSX may well persuade a jury that its position is correct, the Court finds that the record, construed in the light most favorable to Miller, does not entitle CSX to entry of summary judgment on this basis.

Punitive Damages

CSX contends that, even if summary judgment is denied with respect to its liability under FRSA, it is entitled to judgment on Miller's claim for punitive damages under that statute.  FRSA permits recovery of punitive damages, not exceeding $250,000, when the record establishes a "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." Murphy Order at 13 (quoting Cain v. BNSF Rwy Co., ARB Case No. 13-006, 2014 WL 4966163, at *7 (DOL Sept. 18, 2014)).  CSX contends that there is no evidence to support a punitive damages award. Miller cannot dispute that he lied about his injury, and the facts do not support a claim that CSX engaged in any reckless conduct, much less an intentional violation of federal law.

Miller disagrees, citing Barati v. Metro-North R.R.Co., 939 F.Supp.2d 143 (D.Conn. 2013), where a jury awarded punitive damages to plaintiff, who was injured while performing a task in the manner in which he had been trained.  He reported the

injury, and was then disciplined and terminated.  Evidence at trial revealed that plaintiff

was treated differently than other employees who allegedly violated safety practices,

and that the railroad's written safety manual included an instruction to perform the

particular task in a manner that differed from the one that plaintiff had been taught to

follow.

Despite the factual dispute about his injury, Miller argues that a jury could find

that CSX acted recklessly and disregarded his rights.  He notes that within 24 hours of

his report of the injury, he was notified that he was subject to investigation and kept off

work pending the outcome.  Henry's August 27 email to Hamby suggests that the only

question was how much discipline would be imposed.  Miller also asserts  that, based

on his conversations with Collett and certain "body language" he perceived during his

August 28 meeting with Spencer and Henry, he was led to believe that if he retracted

his report the investigation would cease and he could return to work.

Construing the evidence in the light most favorable to Miller, as the Court must

do at this juncture, the Court finds that a jury could conclude that an award of punitive

damages would be appropriate after considering all of the evidence.  This conclusion

may, of course, be revisited during any trial of this case.  But the Court denies CSX's

motion for summary judgment with respect to Miller's claim for punitive damages.

<u>Federal Employers Liability Act claim</u>

CSX seeks summary judgment on Miller's negligence claim under the Federal

Employer's Liability Act ("FELA"), 45 U.S.C. §51, et seq.  A prima facie FELA claim

requires Miller to show: (1) he was injured in the scope of his employment; (2) his

employment was in furtherance of CSX's interstate business; (3) CSX was negligent;

and (4) that negligence played a part in causing his injury.  Miller must "prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation."  Van Gorder v. Grand Trunk W. R.R., 509 F.3d 265, 269 (6th Cir. 2007) (internal citations omitted).  The statute does incorporate a relaxed burden of proof on causation: if an employer's negligence played any part, however slight, in causing the injury, it is sufficient.  However, that relaxed standard does not apply to a plaintiff's obligation to prove that the railroad was negligent.

A railroad's duty to its employees is to provide a reasonably safe workplace, a principle that neither party disputes.  CSX argues that Miller has not shown that it breached that duty.  Miller testified that the locomotive from which he stepped down the night in question had a lower step that was "too high."  He testified that there was not enough overhead light, and he did not have batteries for his flashlight.  And he claimed that he stepped down on loose ballast, which caused him to slip.  Miller has not disclosed a witness to testify about standards that may apply to the height of locomotive steps, or to the amount of overhead light provided at the Cincinnati terminal, either generally or specifically on the night of the incident.  CSX notes that Miller conceded he had "enough" light to be able to look and see where he was stepping down from the train.  And despite his claim that he could not use his flashlight, Miller conceded that his assignment that night had been changed to one that called for the use of his lantern, which he was carrying with him at the time of the incident.  With regard to the condition of the ballast and track, Miller testified that the incline was "higher than normal" and the ballast was loose.  Miller has no witness regarding the angle or height of the incline, or how it may have deviated from normal and standard; he cannot even describe with any

specificity where the incident actually occurred.  He also admitted that when he looked down, the ballast looked normal to him.

Miller responds by citing his own testimony that he did not have "enough" light, because he did not have batteries for his flashlight.  He suggests that this is sufficient to place his claim before the jury, citing FELA's relaxed causation standard.  But Miller's own testimony is not enough to show that CSX breached its duty to him to provide a **reasonably** safe work environment.  Van Gorder fully supports this conclusion.  There, plaintiff alleged that the railroad was negligent in conducting a pre-trip inspection of a door on the railroad car, and that a more thorough inspection would have revealed a defective bolt that caused his injury.  His expert submitted a declaration that the railroad did not act "reasonably" to inspect the car because it did not discover the bolt's condition.  The court noted that the expert did not describe what would constitute a proper inspection, and had not inspected the car in question.  The expert's affidavit failed to raise a genuine dispute that the railroad breached its duty to use ordinary care under the circumstances, or that it knew or should have known that normal inspection routines were somehow inadequate to protect the plaintiff.

The same conclusion applies here.  Miller claims that he did not have "enough" light, but also admitted that he could see well enough to step down from the train.  His subjective belief that he lacked "enough" light is not sufficient to establish that CSX breached its duty of care.  CSX is therefore entitled to summary judgment on Miller's FELA claim.

Motion to Exclude Expert Witnesses

In response to CSX's initial interrogatories, Miller identified three potential experts

-31-

he intended to call at trial.  He provided a report from one (Dr. Baldwin), but did not provide a report from Dr. Huston.  In response to CSX's motion, Miller states that he does not intend to call Dr. Huston as an expert.  The third expert he identified is Dr. Grefer, Miller's treating orthopedic surgeon.  CSX's motion argues that Miller never supplemented his interrogatory to disclose Dr. Grefer's opinions and the basis for any opinions he intends to offer.  Therefore, he should not be permitted to testify as an expert and offer opinions at trial.

Fed. R. Civ. Proc. 26(a)(2) categorizes expert witnesses who must provide a full written report (subsection (B)), and those who do not (subsection (C)).  Dr. Grefer, as Miller's treating physician, falls within subsection (C), because he was not retained or specially employed to provide testimony in this case, nor is he Miller's employee.  Rule 26(a)(2)(C) requires Miller to disclose the subject matter on which Dr. Grefer is expected to present evidence, and a "summary of the facts and opinions" he is expected to offer at trial.  Avendt v. Covidien Inc., 2014 U.S. Dist. LEXIS 175843, **11-12 (E.D. Mich. 2014).  Miller concedes that he has not complied with this Rule, but complains of CSX's "hyper-technical approach," suggesting that CSX should simply ask for the information.  But CSX did ask for the identity of Miller's experts; and Rule 26(a)(2) places the burden of producing the required summaries or reports of identified experts upon the party offering the expert witness, not upon the opposing party.

CSX's motion to exclude Dr. Grefer's testimony, to the extent that the testimony is based upon anything outside of the course of his medical treatment of Miller, is therefore granted.  Miller is free to offer Dr. Grefer's testimony as a fact witness, based upon his treatment as reflected in records that have been produced to CSX.

-32-

**CONCLUSION**

For all of the foregoing reasons, Defendant CSX's motion for summary judgment (Doc. 62) is granted in part, with respect to Miller's FELA claim.  The motion is denied in part, with respect to Miller's FRSA claim.  CSX's motion to exclude expert testimony (Doc. 60) is granted.

SO ORDERED.

DATED: August 25, 2015                    s/Sandra S. Beckwith
                                          Sandra S. Beckwith, Senior Judge
                                          United States District Court